K. ERIK FRIESS (BAR NO. 149721)
Email: rfriess@allenmatkins.com
LUCAS A. URGOITI (BAR NO. 333452)
Email: lurgoiti@allenmatkins.com
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone:  (949) 553-1313
Fax:  (949) 553-8354

Attorneys for Plaintiff
DNBA PROPERTIES, LLC, a Delaware
limited liability company

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DNBA PROPERTIES LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br><br>    vs.<br><br>CITY OF SAN JACINTO, a municipal corporation; WESTERN RIVERSIDE COUNTY REGIONAL CONSERVATION AUTHORITY; and DOES 1-10,<br><br>        Defendants. | Case No. 5:25-cv-2008<br><br>**COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE CIVIL RIGHTS ACT, 42 U.S.C. SECTION 1983 (INVERSE CONDEMNATION/DE FACTO PHYSICAL TAKING);**<br><br>**(2) DECLARATORY RELIEF REGARDING INVERSE CONDEMNATION/DE FACTO PHYSICAL TAKING; AND**<br><br>**(3) DECLARATORY RELIEF REGARDING THE ILLEGALITY OF DEFENDANT WESTERN RIVERSIDE COUNTY REGIONAL CONSERVATION AUTHORITY'S PROPERTY-ACQUISITION PROCESSES**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................4

THE PARTIES ......................................................................................7

JURISDICTION AND VENUE .............................................................8

GENERAL ALLEGATIONS ................................................................8

A.  With the adoption and implementation of the Western Riverside County Multiple Species Habitat Conservation Plan in 2004, the RCA was charged with acquiring 153,000 acres of privately owned land within just 25 years. ...........................................................................................8

B.  By 2008, the wheels on the MSHCP "bus" started to loosen.  And the RAND Corporation issued a report that foreshadowed the demise of the RCA and MSHCP. .........................10

C.  By 2019, the wheels on the MSHCP "bus" were falling off – a Riverside County Grand Jury completed an investigation of the RCA and issued a scathingly critical report. ...........................................................................................12

D.  In or around 2021, the City knew that DNBA's property was within the MSHCP's Criteria Cells and subject to conservation but did not direct DNBA to complete MSHCP's (illegal) property-acquisition processes. Instead, for more than *three years*, the City and RCA pretended to collaborate with DNBA on its commercial project to bank/de facto take DNBA's property without paying just compensation...........................................................18

E.  In 2024, the RCA and City stopped pretending to collaborate with DNBA on its planned commercial center. The RCA returned to its playbook once again for another delay maneuver – forcing DNBA to needlessly engage in the MSHCP's (illegal) property-acquisiton processes........................19

    1.  To start, the RCA forced DNBA to engage in the MSHCP's "Habitat Acquisition and Negotiation Strategy" to get the City to formally admit that the MSHCP calls for 100 percent conservation of DNBA's property...........................................................20

    2.  Next, the RCA pretended to participate in the MSHCP's "Joint Project Review" process to make DNBA believe that the RCA would formally admit that it must acquire and conserve DNBA's property. ..............22

    3.  In another delay maneuver, the RCA demanded that DNBA process a "Criteria Refinement" as a purported "remedy" to allow for the development of

**Page**

DNBA's planned commercial center.  Nothing in the MSHCP nor California law allows the City and the RCA to impose this burden on DNBA. ..............................25

4.    In May 2025, the RCA's next "play" from its playbook was to refuse to advance DNBA's JPR application to completion by lying and deeming it "incomplete."  The RCA is wrong and contradicted by the MSHCP's Plan and the RCA's and City's conduct. ........................................................................27

5.    Turning a blind eye to its obligations under the JPR process, in June 2025, the RCA enlisted the City's help to delay further its acquisition of DNBA's frozen-in-place property, by having the City demand, again, that DNBA process a Criteria Refinement. ...............................................................28

F.    No further administrative or other remedies are or were available to DNBA that could lift the conservation hold that the City and RCA have placed on DNBA's property. .................29

FIRST CAUSE OF ACTION Violations of the Civil Rights Act, 42 U.S.C. Section 1983 (Inverse Condemnation/De Facto Physical Taking) – Against the City and the RCA ...............................................31

SECOND CAUSE OF ACTION Declaratory Relief Regarding Inverse Condemnation/De Facto Physical Taking – Against the City and the RCA ..........................................................................................................33

THIRD CAUSE OF ACTION Declaratory Relief Regarding the Illegality of the RCA's MSHCP Property-Acquisition Processes – Against the RCA ...............................................................................35

PRAYER ...............................................................................................36

DEMAND FOR JURY TRIAL ...............................................................39

1    Plaintiff DNBA Properties, LLC, alleges as follows:

2                              **INTRODUCTION**

3        1.    Plaintiff DNBA Properties, LLC, owns four parcels totaling

4    approximately 2.7 acres of undeveloped property in the City of San Jacinto,

5    Riverside County, which have been banked/de facto taken by defendants City of San

6    Jacinto and Western Riverside County Regional Conservation Authority in violation

7    of the Civil Rights Act, 42 U.S.C. section 1983 (inverse condemnation/de facto

8    physical taking).  See 28 U.S.C. §§ 1331, 1343.

9        2.    In 2003, the County of Riverside, the Riverside County Transportation

10   Commission, or the "RCTC," and various western Riverside cities, including

11   defendant City of San Jacinto, adopted a habitat conservation plan and created

12   defendant Western Riverside County Regional Conservation Authority, or the

13   "RCA," to acquire the conservation acres for that habitat conservation plan,

14   commonly known as the Western Riverside County Multiple Species Habitat

15   Conservation Plan, or "MSHCP."  And (although neither the City nor the RCA told

16   this to DNBA's President before he bought DNBA's property in 2020), the City and

17   the RCA covet DNBA's land as crucial for implementing that conservation plan.

18       3.    Grotesquely, the County, the RCTC, and the cities have not provided

19   adequate funding to allow for the RCA's timely acquisition of the properties that the

20   RCA must have for the MSHCP.  So the RCA and its sponsoring government

21   agencies have devised a playbook of delay strategies for "banking" land that the

22   RCA needs to complete the conservation plan – without the RCA's or the other

23   agencies' paying just compensation for that land.  And since DNBA's property is

24   land that the RCA specifically wants and crucially needs for the MSHCP, the RCA,

25   along with the City, went to, and continue to go to, extremes to avoid paying DNBA

26   just compensation and have thereby banked/de facto taken DNBA's property as part

27   of the RCA's MSHCP reserve.

28       4.    Since at least 2021, the City has publicly recognized that DNBA's

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

property is located within the MSHCP's Criteria Cells, which the MSHCP mandates for conservation as part of the MSHCP's reserve. Also in 2021, DNBA was pursuing commercial development of its property. So in the early days of the RCA's scheme to bank/de facto take DNBA's property for the reserve, the City began insisting that DNBA attempt an application for a "Criteria Refinement" – an amendment to the MSHCP – which is *not* mandated by the MSHCP nor a "remedy" recognized by the law. Furthermore, the MSHCP expressly states, in section 6.5, that "[t]he CR [Criteria Refinement] process shall *not* be used for initial project review of project consistency with Criteria or for initial identification of potential properties for acquisition." Still, DNBA, acting in good faith, collaborated with the City and the RCA to formulate a plan to develop DNBA's property in a manner compatible with the MSHCP. The City and RCA took advantage of the DNBA's willingness to cooperate by dragging out the City's review process for DNBA's planned commercial center for more than *three years*.

5.    Eventually, in 2024, the City and RCA forced DNBA to engage in the MSHCP's (illegal) property-acquisition processes, which were pointless because the City and RCA already knew that the RCA required 100 percent of DNBA's property for the MSHCP. But by imposing the MSHCP's property-acquisition processes on DNBA, the City and the RCA knew that they could continue to avoid paying just compensation to DNBA for additional years and years. To accomplish that, the City and RCA refused to, among many other things, follow the MSHCP's time limits and other procedural requirements, including the RCA's refusing to make a purchase offer, refusing to negotiate, and delaying any substantive communications with DNBA.

6.    And worse than the City and RCA's refusal to abide by their own set of rules, the City and RCA's forcing DNBA to engage in the MSHCP's property-acquisition processes deprived DNBA of its constitutional and statutory rights; to name a few: (1) DNBA's right to a jury trial (Cal. Const., art. I, § 19); (2) the

"expeditious" acquisition of DNBA's property (42 U.S.C. § 4651; Cal. Gov't Code § 7267.1, subd. (a); *see also* Cal. Code Regs. tit. 25, § 6182, subd. (a)); (3) just compensation based on an "approved appraisal of the fair market value of the property" (Cal. Gov't Code § 7267.2, subd. (a)(1)); and (4) DNBA's right to payment up to $5,000 by the RCA toward an independent appraisal (*see* Cal. Civ. Proc. §§ 1235.170, 1263.025).  The City and RCA's callous disregard for these and other of DNBA's property rights under state and federal law show just how far the City and RCA were and are willing to go to bank/de facto take DNBA's property without paying just compensation.

7.    Still hopeful of a rational process (and, regardless, trapped in the RCA's "process"), DNBA complied with the MSHCP's processes while still calling out the City and RCA's delay tactics as violating DNBA's constitutional rights and violating a host of state and federal land-acquisition laws.

8.    But the City and RCA are still holding DNBA and its property hostage because the City and the RCA do not want to pay one penny of just compensation to conserve that land; they want DNBA to be another of the RCA's forced distress sales; another MSHCP victim.  And, outside of bringing this lawsuit, the City and the RCA know (and chortle) that there is nothing DNBA can do about it.  In fact, the City and RCA have communicated to DNBA and its consultants and attorneys that the City and RCA will not advance DNBA's "Joint Project Review" application to completion, which is a necessary step in the RCA's acquisition process for the MSHCP.  (Advancing DNBA's application would require the RCA to "formally" admit that the MSHCP calls for 100 percent conservation of DNBA's property.)  Instead, the City and RCA continue to demand that DNBA process a "Criteria Refinement."  In other words, under the RCA's MSHCP, the City and RCA get to de facto conserve all the properties they want while paying exactly zero in the constitutionally required just compensation.

9.    All these actions were taken in fulfillment of the City and the RCA's

1 years-long, delay strategy to conserve DNBA's property for the RCA's MSHCP
2 reserve.

3        10.    As a result of all of this, the City and RCA have de facto physically
4 taken DNBA's property for conservation, inversely condemning that property.  By
5 this suit, DNBA seeks to recover just compensation for this unconstitutional, de
6 facto physical taking of its property.

7                                   **THE PARTIES**

8        11.    Plaintiff DNBA Properties, LLC, is a Delaware limited liability
9 company and is the owner of the property designated as Assessor's Parcel Numbers
10 433-455-015, -016, -017, and -018.  Those properties are located in the City of San
11 Jacinto, California.

12        12.    Defendant City of San Jacinto is a municipal corporation located in
13 Riverside County, California, established and organized under the laws of the State
14 of California.

15        13.    Defendant Western Riverside County Regional Conservation Authority
16 is, and at all times mentioned in this complaint was, a public agency created in 2003
17 pursuant to a joint powers agreement between the County of Riverside, the RCTC,
18 the City of San Jacinto, and other cities in Western Riverside County.  The County,
19 the RCTC, and these cities granted the RCA authority to administer and oversee the
20 MSHCP and to acquire the lands required for the MSHCP.  The City and the RCA
21 are parties to the "Implementing Agreement for the Western Riverside County
22 Multiple Species Habitat Conservation Plan/Natural Community Conservation
23 Plan."

24        14.    DNBA is ignorant of the true names and capacities of the defendants
25 sued herein as does 1 through 10, inclusive, and therefore sues these defendants by
26 such fictitious names.  DNBA will seek leave to amend this complaint to allege their
27 true names and capacities when ascertained.  DNBA is informed and believes that
28 each of such fictitiously named defendants is in some manner responsible for the

1  acts, injuries, and damages alleged in this complaint.

2      15.    DNBA is informed and believes that at all times mentioned in this

3  complaint, defendants does 1 through 10, inclusive, were the agents, servants, and

4  employees of their co-defendants and, in doing the things mentioned in this

5  complaint, were acting within the course and scope of their authority as such agents,

6  servants, and employees with the permission and consent of their co-defendants.

7                      **JURISDICTION AND VENUE**

8      16.    This case arises under the United States Constitution and 42 U.S.C.

9  sections 1983 and 1988.  This Court has subject matter jurisdiction pursuant to 28

10  U.S.C. sections 1331 and 1332 and 1343, and 1367(a).

11      17.    This Court is the appropriate venue for this case pursuant to 28 U.S.C.

12  section 1391(b)(2).  Plaintiff DNBA's property is located in this judicial district, the

13  actions complained of took place in this judicial district, documents and records

14  relevant to the allegations are maintained in this judicial district, and the City and

15  RCA are present and conduct their affairs in this judicial district.

16                      **GENERAL ALLEGATIONS**

17  **A.    With the adoption and implementation of the Western Riverside**

18          **County Multiple Species Habitat Conservation Plan in 2004, the**

19          **RCA was charged with acquiring 153,000 acres of privately owned**

20          **land within just 25 years.**

21      18.    In June 2003, the MSHCP was adopted and, within a year,

22  implemented in western Riverside County.  Under the MSHCP, the RCA must

23  acquire 153,000 acres of privately owned land in western Riverside County and hold

24  and manage it as reserve land.  *See MSHCP Conservation Area Description*,

25  Riverside Cnty. Transp. and Land Mgmt. Agency https://rctlma.org/western-

26  riverside-county-multiple-species-habitat-conservation-plan-mshcp-volume-2-

27  section (last visited Aug. 1, 2025).  From the outset, the RCA knew it would acquire

28  DNBA's property for the MSHCP reserve.  Here is a map of the MSHCP Plan Area,

1  which overlays DNBA's property.



15  　　　19.　　A RAND Corporation report commissioned by the RCA in 2008

16  explains that the MSHCP grew out of a recognition by "[p]olicyholders in Riverside

17  County in the 1990s" that "the regulatory process of reconciling environmental and

18  development interests [was] both ineffective and inefficient."

> Responding to this challenge, in 1999, the Riverside County Board of Supervisors and the Riverside County Transportation Commission (RCTC) initiated a comprehensive regional-planning effort called the Riverside County Integrated Project (RCIP). A key element of the RCIP is the Multiple Species Habitat Conservation Plan (MSHCP), a plan to conserve 500,000 acres of the 1.26 million acres in the western part of the county. In return for establishing the conservation reserve, the U.S. Fish and Wildlife Service (USFWS) and the California Department of Fish and Game (CDFG) issued the county and 14 cities in western Riverside County a 75-year "take" permit for endangered species. Finalized in June 2004, the take permit allows the cities and county to approve development projects outside the reserve that may negatively affect sensitive plant and animal species, thus allowing for continued growth and development outside of the reserve area. The agreement vested responsibility for acquiring and managing the reserve with the Western Riverside County Regional Conservation Authority (RCA).

1   The RAND Corporation report and a summary of it can be found through a link on

2   the RCA's website:  *Special Reports*, W. Riverside Cnty. Reg'l Conservation Auth.,

3   https://www.wrc-rca.org/habitat-conservation/special-reports/ (last visited Aug. 1,

4   2025).

5          20.    More specifically, the MSHCP is a habitat conservation plan

6   established in accordance with the Federal Endangered Species Act and similar state

7   law.  As such, the MSHCP is meant to provide protection to threatened or

8   endangered species of plants and animals on a habitat-wide basis rather than on a

9   species-by-species basis.  On its website, the RCA describes the MSHCP as "one of

10  America's most ambitious environmental efforts."  *Habitat Conservation*, W.

11  Riverside Cnty. Reg'l Conservation Auth., https://www.wrc-rca.org/habitat-

12  conservation/ (last visited Aug. 1, 2025).  As the RCA explains, the MSHCP's

13  purpose is:  "to shape Riverside County's future, balancing the rapid growth the

14  County experienced in the 1980s and 90s with the challenges of traffic congestion,

15  and the listing of native species of plants and animals as threatened or endangered."

16  *FAQS*, W. Riverside Cnty. Reg'l Conservation Auth., https://www.wrc-rca.org/faqs/

17  ("Question:  Why was the MSHCP developed for Western Riverside County?") (last

18  visited Aug. 1, 2025).

19         21.    The MSHCP, as adopted, anticipated that the 153,000 acres "will be

20  assembled by the end of [a] 25-year period," in other words, by 2029.  To make it

21  feasible for the RCA to meet this gargantuan acquisition requirement in this

22  relatively short period, massive funding for the MSHCP was and is required.  In that

23  regard, the MSHCP establishes (in section 8.1) that:  "Funding is an essential

24  element of the Western Riverside County MSHCP."

25     **B.     By 2008, the wheels on the MSHCP "bus" started to loosen.  And**

26             **the RAND Corporation issued a report that foreshadowed the**

27             **demise of the RCA and MSHCP.**

28         22.    With an initial guarantee from the Riverside County Transportation

Commission of $153,000,000 in funding and with the momentum associated with the 2003 adoption of the first really large-scale, multiple species habitat conservation plan, the RCA initially made decent progress with its MSHCP funding and acquisition goals.  But within a few years, the RCA began to stumble.

23.    In 2008, apparently recognizing that it was starting to face strong headwinds, the RCA retained the RAND Corporation to study the RCA's problems. In the introduction to the RAND Corporation's report from its study (again, which report and a summary of it, as noted, can be found through a link on the RCA's website), the RAND Corporation explained that:  "While [the MSHCP] is a potential model for other areas in the county, questions remain about the cost of assembling and operating the reserve, the adequacy of the revenue sources, [and] the prospect for achieving the habitat-conservation goals specified in the MSHCP … ." *Special Reports*, W. Riverside Cnty. Reg'l Conservation Auth., https://www.wrc-rca.org/habitat-conservation/special-reports/ (last visited Aug. 1, 2025).

24.    The RAND Corporation identified that dark clouds were forming around the RCA's efforts to acquire the tens of thousands of acres still required for the MSHCP and around other aspects of the RCA's implementation of the MSHCP. Among the dark clouds:

- Fee revenues were falling short.
- Grant revenues from the state and federal governments for the MSHCP were falling short.
- Acquisitions of MSHCP lands by state and federal agencies were falling short.
- Acquisitions of MSHCP lands from County and city development exactions were falling short.
- And prices for the lands that the RCA had acquired up to that time cost a multiple of the per-acre prices assumed in the MSHCP's budget projections.  Plus the RCA had largely acquired the "cheapest" of the

1    acreage it needed for the MSHCP; the RAND Corporation projected

2    that the remaining acres that the RCA still had to acquire would be

3    even more (much more) expensive than the acres that the RCA had

4    acquired through 2008.

5    25.    As a result, the RAND Corporation's report concluded:  "the value of

6    the land needed to complete the [MSHCP] reserve is an estimated $4.2 billion, with

7    a 95-percent statistical confidence interval running from approximately – 10 percent

8    to +20 percent of the total ($3.8 billion to $5.0 billion)" – which was massively

9    higher than the RCTC, Riverside County, and the cities had budgeted for when they

10    adopted the MSHCP.

11    26.    Another problem:  the RAND Corporation's report identified that, as of

12    2008, the RCA's rate of land acquisitions was much too slow to meet the MSHCP's

13    required 25-year deadline for completing the reserve.  (As described below, the

14    RCA's rate of land acquisition has fallen precipitously during the years since the

15    2008 RAND Corporation report.)

16    27.    The RAND Corporation's report also identified a potential worst-case

17    scenario:  "In less favorable scenarios in which land prices remain relatively high,

18    land contributions through the development process remain low, and revenue ends

19    up at the low end of the projected range, the present value of revenue could fall

20    *several billion dollars short* of expenditures."  (Emphasis added.)

21    28.    In the years to come, the RAND Corporation's worst-case scenario

22    became the actual scenario for the RCA's MSHCP reserve.

23    **C.    By 2019, the wheels on the MSHCP "bus" were falling off – a**

24    **Riverside County Grand Jury completed an investigation of the**

25    **RCA and issued a scathingly critical report.**

26    29.    By 2019, the RAND Corporation's worst-case scenario was becoming

27    a reality:  the RCA's rate of land acquisitions was down, land prices in western

28    Riverside County were up, and MSHCP funding was continuing to fall short.

30.     Riverside County, like all California counties, has a civil grand jury charged with oversight of the operations of county and municipal governments. The 2018-2019 Civil Grand Jury investigated the RCA and issued a report in June 2019, which can be found on the County's website. *Civil Grand Jury Reports and Responses*, https://countyofriverside.us/Home/GrandJury.aspx (last visited Aug. 1, 2025).

31.     At the conclusion of its investigation, the Grand Jury made scathing findings about the RCA and its implementation of the MSHCP. The specific findings were (highlighting added):

**FINDINGS**

Inadequate Board Oversight
1. RCA Board Members often have a limited understanding of the very complex requirements and obligations of this conservation agency. They need more measurable information on the long term trends of the RCA. Many elected Board Members do not remain on this Board for more than a few years, and so institutional memory of the Board is often limited. Only the Executive Board appears to make decisions about setting the agenda.

Board Lack of Awareness of Financial Pitfalls
2. The RCA Board has not acknowledged its inability to meet the current time table for acquisition of habitat conservation lands. The current rate of land acquisition has slowed to the point where it is unlikely to expect that it will meet The Plan's goal of completion of habitat land reserve within the remaining ten years of the 25 year plan.

Over $1 Billion Dollars Will Be Needed Within the Next Ten Years!
3. Even with the RCA's recent estimate of land acquisition costs at $13,000 per acre, the necessary land acquisition costs to complete The Plan are expected to be a staggering $1.0 to $1.5 billion dollars. This represents a significant financial risk to the County.

Endowment Fund is Underfunded

4. The Plan calls for an endowment fund of $70,000,000 to support future monitoring and maintenance of habitat lands. At this time, the fund is severely underfunded currently at about $5,800,000. The failure to build this reserve fund, the interest income of which would fund habitat maintenance activities in perpetuity, could obligate the participating cities to carry these costs after completion of the land acquisition requirement.

Efficiencies of Outside Contractors vs. In-House Staff

5. RCA outsources many costly contracts to outside parties for legal services, plan implementation, real property services, and other professional services. These costs drain the limited general funds, used to build up the endowment and other services. RCA contracts with an outside company to act as a middle-man for projects that are negotiated between developers and RCA staff. The outside company agents explain the MSHCP process, provide interpretation and deliver a completed packet of documents for the RCA joint project reviews.

Insufficient Financial Commitment for Maintenance & Security of Habitat Reserve

6. The Plan Land Management budget does not provide sufficient park rangers for increased land patrol and maintenance responsibilities of the expanding habitat reserve. The maintenance and security of the current accumulated 400,000 acres of conservation land is suffering from damages caused by fires and floods, as well as off-highway vehicles

(OHV), and homeless encampments. This damage will only increase in the future.

Legislative Solutions for Funding Are Far From Certain

7. RCA continues to spend over $200,000 annually, of its own limited, local general funds for two K-Street lobbyists. Their proposals repeatedly seek funding resources through legislative alternatives. These approaches have indeterminate and un-measureable outcomes.

Lack of Public Understanding

8. RCA is an obscure agency. The taxpaying, voting public is not aware of its valuable contributions to the conservation of the environment or to the development of public infrastructure in the County.

More Useful Annual Reports

9. The information in the Annual Reports meet the minimal requirement set out in The Plan, but do not discuss financial issues of concern or proposed remedies and actions. They do not provide comment on whether the income receipts and the rate of the land acquisition are sufficient for the RCA to meet its goal of acquiring sufficient habitat lands to assemble the reserve within 25 years.

Consolidation of Duplicate Bureaucracy

10. RCA is a free-standing JPA. The other two habitat conservation agencies in the County, HCA and CVCC, are not free-standing and are subject to a higher level of public visibility along with managerial and financial oversight provided by the existing multi-city management structure.

32.    The Grand Jury then made specific recommendations to the RCA and its leaders to try to address these many problems (highlighting added):

## Recommendations

## Western Riverside Regional Conservation Authority
## Riverside County Board of Supervisors

### Inadequate Board Oversight

1. The RCA Executive Board needs to ensure that all Board Members are adequately trained in the mission and operational mechanisms of The Plan. Board Members must fully understand their essential role as primary policy makers of the RCA. The Executive Board should develop timely evaluations of the performance of The Plan, and report on the progress of RCA in meeting its goals to the Board. They need to ensure that information about the long-term trends of this agency is understood by all Board Members.

### Board Lack of Awareness of Financial Pitfalls

2. The Executive Board needs to direct the RCA staff to provide members of the Board with actionable information about the long term trends in income and land reserve. This will illuminate the concern about progress towards the land acquisition goal of The Plan.

### Over $1 Billion Dollars Will Be Needed Within the Next Ten Years!

3. The Executive Board urgently needs to work with the RCA staff to identify all options anticipated in the 2017 Nexus report regarding the revision of the scheduled mitigation fees. In addition to other funding mechanisms, including loans and alliances with other federal agencies, the Board should explore other options to meet the overwhelming costs of future land acquisition. The Executive Board should make recommendations, provide justification for proposed mitigation rate increases and present other tax options to the entire Board for review and confirmation. Tax options are described in the 2008 Rand report. The Board should convene the Funding Coordination Committee, which is described in The Plan, Volume 1, Section 6.6.2.D, and meet with the wildlife agencies to address these common funding concerns. All agencies, including the wildlife agencies, need to improve collections to meet their land acquisition goals.

Endowment Fund is Underfunded

4. The Executive Board should require the RCA staff to propose options for building the endowment fund to the level of $70,000,000 to support habitat monitoring and maintenance for the remaining 50 years of The Plan. The RCA management staff needs to clearly report on the level of the underfunded endowment reserves for future protection of the MSHCP lands in conjunction with the quarterly budget reports.

While it is possible to delay the accumulation of an endowment fund for future habitat monitoring and maintenance, doing so would reduce the time needed to reach the land acquisition goal. It would be a risky option since recent fee collections have been so low. The entire Board needs to be aware of the status of resources needed to complete the acquisition of the land reserve and the endowment to support the maintenance of the future expansive land reserve. They should review proposals to seek nonprofit funding to build up the endowment.

Efficiencies of Outside Contractors vs. In-House Staff

5. RCA management staff should review the use of internal staffing versus the use of many costly outside contractors. More biological assessment and land acquisition activities could be brought in-house. Trained in-house staff could handle more basic biological assessment and land acquisition duties. Many fees paid to outside contractors could be reduced by efficient use of internal staffing.

Insufficient Financial Commitment for Maintenance & Security of Habitat Reserve

6. Shift resources to add more contract land management park rangers. Coordinate with County Sheriff and Code Enforcement Departments to assist park rangers in controlling on-going damage to the habitat reserve from trespassers, mountain bikes and excess motor sport vehicles, as well as homeless encampments. Seek available grants from California Off-Highway Motor Vehicle Registration for management of OHV recreation and security. Use funds for posting signage and limiting vehicle access into the preserve and for repairs on the expanded acreage of protected lands.

Legislative Solutions for Funding Are Far From Certain

7. Review the effectiveness and over-reliance on K-Street lobbyists as a source of needed future fundings. Consider integration of RCA habitat lobbying with other County lobbying efforts.

Lack of Public Understanding
8.  RCA should improve outreach efforts to the general taxpaying, voting public. Provide public education about the RCA's conservation mission and build a public constituency of those who may be asked to approve future funding mechanisms to support its goals. Create public understanding of the importance of this conservation plan in reducing delays in the development of public infrastructure projects and the value of protecting the habitat for endangered species.

More Useful Annual Reports
9.  The Annual Report should serve as a benchmark to be used for evaluating compliance with The Plan requirements and goals. The report should provide graphic description of the RCA's progress towards The Plan conservation goals. It should identify significant issues in The Plan implementation and proposed remedies for concerns which may delay implementation. Copies of the Annual Report should be made available to the public and presented at an open workshop where they may comment.

Consolidation of Duplicate Bureaucracy
10. The consolidation of RCA within an existing multi-city management structure would provide:
   - Operational improvement
   - Reduction of duplication of bureaucracy
   - Cost reduction
   - Increased public visibility
   - Increased financial oversight

   WRCOG could serve this function, as Coachella Valley Association of Governments (CVAG) does for Coachella Valley Conservation Commission (CVCC).

33.    After the Grand Jury's report, the general public's opinion of the RCA was at an all-time low.

**D.    In or around 2021, the City knew that DNBA's property was within the MSHCP's Criteria Cells and subject to conservation but did not direct DNBA to complete MSHCP's (illegal) property-acquisition processes.  Instead, for more than *three years*, the City and RCA pretended to collaborate with DNBA on its commercial project to bank/de facto take DNBA's property without paying just compensation.**

34.    In or around August 2020, DNBA acquired its property for a planned commercial center with two fast-food restaurants (Popeyes and Jack in the Box), a retail building for five retail stores and associated parking and landscaping.  The parcels were ripe for development, given that DNBA's predecessor had made numerous improvements to the property, including installing underground facilities and infrastructure, clearing and grading, and pad preparation.  (The City has recognized these improvements.)  DNBA's parcels are outlined in yellow (also identified by Assessor's Parcel Number) in the aerial image below from First American's ClarityFirst website:



35.    Soon after the acquisition of its property, in or around 2021, DNBA submitted development applications for DNBA's planned commercial center. During the City's review process, City staff informed DNBA that DNBA's property

falls within the MSHCP's Criteria Cells 3099 and 3204, Cell Group Z and is potentially reserved for conservation. The red arrow in this image points to DNBA's property in the MSHCP's Criteria Cells.



36.     Even though the MSHCP's Criteria Cells mandate 100 percent conservation of DNBA's property, the RCA had refused to formally admit that. The City knew this as well, yet never directed DNBA to engage in the MSHCP's (illegal) property-acquisition processes. Instead, the City demanded that DNBA attempt an application for a "Criteria Refinement," which, as discussed more fully below, is *not* mandated by the MSHCP nor a "remedy" recognized by the law. Because a Criteria Refinement for DNBA's property is never actually going to happen, the City dragged out its review process for DNBA's planned commercial center for more than *three years*. All the while, DNBA, acting in good faith, collaborated with the City and the RCA to formulate a plan to develop the property in a manner compatible with the MSHCP.

**E.     In 2024, the RCA and City stopped pretending to collaborate with DNBA on its planned commercial center. The RCA returned to its playbook once again for another delay maneuver – forcing DNBA to needlessly engage in the MSHCP's (illegal) property-acquisition processes.**

37.     In or around 2024, the City and the RCA took a new approach of "delay, delay, delay" by imposing the MSHCP's property-acquisition processes on

1  DNBA to further destroy the marketability, and thus further depress the value, of

2  DNBA's property, so that the City and the RCA could pay less than just

3  compensation for the property when – and if – they finally decide to pay something

4  for it.

5      38.    To accomplish this, the City and the RCA forced DNBA to engage in

6  three of the MSHCP's property-acquisition processes.  Knowing its property was

7  coveted by the RCA and was required as conservation land for the MSHCP, DNBA

8  complied with the City and the RCA's demands.

9      **1.    To start, the RCA forced DNBA to engage in the MSHCP's**

10          **"Habitat Acquisition and Negotiation Strategy" to get the**

11          **City to formally admit that the MSHCP calls for 100 percent**

12          **conservation of DNBA's property.**

13     39.    The "Habitat Acquisition and Negotiation Strategy" process,

14  commonly known as HANS, is used to determine whether all, a portion, or none of a

15  property is needed for the RCA's MSHCP reserve system – obviously, DNBA's

16  property was needed for land conservation.  But the RCA forced DNBA to engage

17  in the HANS process for DNBA to obtain the RCA's admission of that fact.  Here is

18  a breakdown of the HANS process (highlighting added):

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25    40.    As this flowchart shows, the HANS process is supposed to be very

26 quick, starting with a 45-day turnaround time for a determination either that a

27 property is or is not needed for the RCA's MSHCP reserve – this is part of the

28 process commonly known as HANS I.  (MSHCP, § 6.1.1.)  Yet DNBA's HANS I

1  process proceeded at a snail's pace, which was just the type of delayed procedure

2  that the RCA was counting on.

3       41.    After more than three years of the City's "collaboration" with DNBA

4  on the development of DNBA's planned commercial center, in April 2024, the

5  City's Planning Department, from nowhere, demanded that DNBA conduct a

6  biological resources habitat assessment and MSHCP consistency analysis as part of

7  the HANS I process. Although the City could have (and legally should have) made

8  this demand on DNBA years earlier, DNBA, acting in good faith, directed its

9  consultant to comply with these requests.

10       42.    On October 11, 2024, DNBA submitted its HANS application to the

11  City of San Jacinto, including all required supporting analyses. On or about

12  November 25th, the 45-day period for the HANS I determination expired without

13  any formal determination from the City to the RCA about the conservation of

14  DNBA's property. In fact, many more weeks passed without any progress. The

15  City's weeks-long delay (really years-long delay) was the perfect excuse for the

16  RCA to keep delaying its acquisition of DNBA's frozen-in-place property.

17       43.    Thanks to DNBA's consistent outreach to the City to keep the HANS I

18  process moving, on or around December 11, 2024, the City finally reported to

19  DNBA's consultant that *100* percent of DNBA's property must be acquired for

20  inclusion in the MSHCP by agreeing to initiate the MSHCP "Joint Project Review"

21  process, i.e., JPR, with the RCA. Initiating the JPR process meant that the RCA

22  would (finally) have to "formally" announce within just *14* days that it agreed with

23  the City's determination of 100 percent conservation of DNBA's property.

24       **2.**    **Next, the RCA pretended to participate in the MSHCP's**

25                **"Joint Project Review" process to make DNBA believe that**

26                **the RCA would formally admit that it must acquire and**

27                **conserve DNBA's property.**

28       44.    The JPR process' 14-day turnaround time starts once the RCA receives

a *completed* JPR application from the City *and* the applicant pays a $1,500 deposit. (MSHCP, Vol. 1, § 6.6.2(E)(2), at p. 6-83; RCA.)  This is an image of the MSHCP's Joint Project Review (JPR) Process Flow Chart (highlighting added.)



45.    On December 11, 2024, DNBA submitted its completed JPR application and delivered its $1,500 JPR deposit check *overnight* to the City.  The next day, the City confirmed its receipt of the check.

46.    Next, on December 19th, the City submitted the DNBA's completed JPR application and deposit check to the RCA.  The RCA received them on December 30th.  On the next page is an image of DNBA's completed JPR application that confirms the RCA's receipt (highlighting added.)

Page 1 of 2

**Regional Conservation Authority**
Western Riverside County

*A Joint Powers Authority*

RECEIVED
DEC 3 0 2024
Western Riverside County
Regional Conservation Authority

**RCA Joint Project Review (JPR) Application**

The 14-day Joint Project Review timeline does not start until the RCA receives this completed application, the required project information, and the $1,500 deposit.

Date: December 19, 2024
Permittee Name: City of San Jacinto
Address: 595 S. San Jacinto Ave
San Jacinto, CA 92583

Contact Name: Kevin White, Planning Manager
Email: kwhite@sanjacintoca.gov
Phone #: 951.487-7330 x 306
Fax #: 951.654.3728

Permittee Project Number/Name: San Jacinto Development, DNBA Property LLC

APN #(s): 433-455-015, 433-455-016, 433-455-017, and 433-455-018

Total Acres of Project Site: 2.37 acres

Total Acres Planned for Development: 0.0 acres (applicant wanted full development)

Total Acres Planned for Conservation: 2.37 acres (applicant wanted 0.0 acres of conservation)*

47.    The RCA's deadline to review and respond to DNBA's completed JPR application was January 13, 2025, i.e., a 14-day review period.  (See MSHCP, Vol. 1, § 6.6.2(E)(2), at p. 6-83.)  The RCA blew its January 13th deadline, refusing to formally admit that the MSHCP mandates 100 percent acquisition of DNBA's property.

48.    Also on January 13th, the RCA sent *the City* (not DNBA) a letter claiming without explanation that the DNBA's JPR application was "incomplete" and returning the deposit check.  (As explained later, DNBA was not informed of the January 13th "incomplete" letter or the returned deposit check until many months later.)  On the next page is an image of the January 13th "incomplete" letter (highlight added).

January 13, 2025

City of San Jacinto
Attn: Kevin White, Planning Manager
595 S. San Jacinto Ave
San Jacinto, CA 92583

RE: Joint Project Review

Dear Kevin White,

As of the date of this letter, the Western Riverside County Regional Conservation Authority (RCA) has been informed that an incomplete JPR application was received. Therefore, we are returning check #1168 issued by DNBA Properties, LLC in the amount of $1,500.00.

If you have questions or need additional information, please feel free to call Tricia Campbell at 951-787-7141.

Sincerely,

Jennifer Fuller
Financial Administration Manager

49.    Within a few weeks, the RCA had formulated its next delay strategy to avoid admitting it had to acquire DNBA's property for the RCA's MSHCP reserve. More specifically, on January 27th, the City emailed DNBA's consultant stating that the RCA had a "solution" that would purportedly allow for the development of DNBA's property.

**3.    In another delay maneuver, the RCA demanded that DNBA process a "Criteria Refinement" as a purported "remedy" to allow for the development of DNBA's planned commercial center. Nothing in the MSHCP nor California law allows the City and the RCA to impose this burden on DNBA.**

50.    In or around February 2025, the RCA demanded that DNBA process a Criteria Refinement, which, as mentioned earlier, is *not* authorized by the MSHCP nor a practical or realistic "remedy."

51.    To reiterate, the MSHCP expressly states, in section 6.5, that "[t]he CRP process shall *not* be used for initial project review of project consistency with

1  Criteria or for initial identification of potential properties for acquisition."
2  (Emphasis added.)  Instead, that is done under the HANS/JPR process.  And the
3  HANS/JPR process calls for review *early* in the development process and has very
4  short timeframes/deadlines (which the City and RCA blew).  As an early-in-the-
5  development-process review, the HANS/JPR process must be completed long *before*
6  a final development application is complete.  Nowhere does the MSHCP authorize
7  the City or the RCA to stall that process by demanding an application for a Criteria
8  Refinement.  So the MSHCP mandates that the City and RCA complete the
9  HANS/JPR process *immediately* (again, really years ago).

10      52.    Aside from it being illegal, the RCA's imposing a Criteria Refinement
11  requirement on DNBA, the processing of a Criteria Refinement application is a
12  time-intensive and financially burdensome *discretionary* process involving, among
13  other things, consistency and equivalency analyses.  A Criteria Refinement costs
14  hundreds of thousands of dollars to process, including the costs for compliance with
15  CEQA and NEPA, and takes several years to complete, if it can ever be completed.

16      53.    Despite all of this, DNBA, acting, yet again, in good faith, directed its
17  consultant to spend the time necessary to determine whether a Criteria Refinement
18  was feasible.  The consultant communicated with the City of San Jacinto and RCA,
19  including the RCA's Regional Conservation Director Aaron Gabbe and Reserve
20  Monitoring and Management Manager Tricia Campbell, for over three months
21  before DNBA recognized that the Criteria Refinement process was not viable.
22  During that time, tellingly, neither the City nor the RCA offered a guarantee that the
23  RCA would grant a Criteria Refinement that would provide DNBA with an
24  economically viable development.  And the RCA did not volunteer to assume the
25  CEQA lead agency role for DNBA's processing of a Criteria Refinement.  (Also, at
26  no time during DNBA's months-long collaboration on a potential Criteria
27  Refinement did the RCA or the City ever mention to DNBA the RCA's January 13th
28  "incomplete" letter.)

54.    Based on all of this, DNBA realized the RCA's Criteria Refinement demand was, aside from being illegal and infeasible, just the RCA's attempt to stall the JPR application process, which, again, would force the RCA to "formally" admit that the MSHCP requires the RCA to acquire 100 percent of DNBA's property

55.    In his May 12, 2025, letter, DNBA's consultant informed the City that DNBA would not process a Criteria Refinement.  The May 12th letter also reiterated the need for the RCA's final JPR determination and a fair-market-value offer to purchase DNBA's property during the MSHCP's 120-day negotiation period, i.e., the HANS II process (MSHCP, Vol. 1, § 6.1.1(C)(2), at p. 6-7).

56.    Once again, the RCA reopened its playbook and ran another delay maneuver to continue the banking/de facto taking of DNBA's property without paying just compensation.

**4.    In May 2025, the RCA's next "play" from its playbook was to refuse to advance DNBA's JPR application to completion by lying and deeming it "incomplete."  The RCA is wrong and contradicted by the MSHCP's Plan and the RCA's and City's conduct.**

57.    When the RCA's Criteria Refinement ploy did not work on DNBA, the RCA directed the City on May 22, 2025, to return DNBA's JPR deposit check.  The City enclosed with that check the RCA's January 13th "incomplete" letter.  That letter was over five months old by then.  Yet that was when DNBA first learned about it – exposing the January 13th incomplete letter as just another of RCA's "plays" in its playbook.

58.    DNBA's JPR application *was* and *still* is complete for at least three reasons that required the RCA to confirm the City's prior determination that 100 percent of DNBA's should be added to the MSHCP reserve.

59.    *First*, as shown in the image on the next page (highlighting added), the City's January 6, 2025, email to DNBA's consultant confirmed DNBA's JPR

1  application was complete.

2      On Mon, Jan 6, 2025 at 3:19 PM Matley, Lori <lmatley@sanjacintoca.gov> wrote:

3      Hi Ed,

       My extension is 401. I will let Frank know you would like to schedule a virtual meeting. The check and documents were sent to RCA ☺

4

5      60.    *Second,* even if DNBA's JPR application was *in*complete (it was not),

6  for more than *five* months, the City and the RCA treated it as if it were complete by

7  negotiating the conditions for a Criteria Refinement for DNBA's property.

8      61.    *Third*, the delivery of the January 13th "incomplete" letter after DNBA

9  decided a Criteria Refinement was infeasible shows the letter was just the RCA's

10 latest delay maneuver to conserve DNBA's land without paying for it.

11             **5.    Turning a blind eye to its obligations under the JPR process,**

12                    **in June 2025, the RCA enlisted the City's help to delay**

13                    **further its acquisition of DNBA's frozen-in-place property,**

14                    **by having the City demand, again, that DNBA process a**

15                    **Criteria Refinement.**

16     62.    When the RCA's latest "play" involving the January 13th "incomplete"

17 letter failed, it had the City step in again by sending a letter on June 24, 2025,

18 baselessly claiming that DNBA must apply for a Criteria Refinement.  The City also

19 made it clear that it would not advance DNBA's JPR application simply because the

20 City believes DNBA's property is "better suited" for development.  In reality, the

21 City's June 24th letter was just the RCA's passing the "delay" baton to the City until

22 the RCA could figure out its next "play" from its playbook of delay strategies.

23     63.    In response, DNBA directed its attorney to send a letter on July 7,

24 2025, to the City, which exposed the City and RCA's demands for a Criteria

25 Refinement and other delay tactics as part of the City and RCA's scheme to avoid

26 paying just compensation for DNBA's property.  For these reasons, the July 7th

27 letter demanded that the City and the RCA immediately complete the JPR process,

28

1  obtain an appraisal for DNBA's property, and make an offer to DNBA.

2      64.    In its continued role as the RCA's right-hand-man, the City never

3  responded to DNBA's attorney's July 7th letter, reaffirming what is obvious at this

4  point:  the RCA's delay tactics are violating DNBA's constitutional rights and

5  violating a host of state and federal land-acquisition laws.

6      65.    In sum, for years DNBA has proceeded with the MSHCP's property-

7  acquisition processes to obtain just compensation for the purchase of DNBA's

8  property.  Notwithstanding all this, now the City and RCA refuse to advance

9  DNBA's JPR application to completion and continue to insist that DNBA process a

10 Criteria Refinement.

11     **F.      No further administrative or other remedies are or were available**

12             **to DNBA that could lift the conservation hold that the City and**

13             **RCA have placed on DNBA's property.**

14     66.    DNBA has exhausted all of its administrative remedies that could be

15 exhausted (to the extent exhaustion is required in a de-facto-physical-taking case

16 like this).  To the extent any other administrative remedies were available,

17 exhausting them would have been futile because the City and RCA refuse to

18 advance DNBA's JPR application to completion and have repeatedly demanded that

19 DNBA pursue a Criteria Refinement.  This is despite the MSHCP's mandate that the

20 City and RCA complete the HANS/JPR process.  Nowhere does the MSHCP

21 authorize the City or the RCA to stall that process by demanding an application for a

22 Criteria Refinement.

23     67.    Furthermore, under the law, a Criteria Refinement does *not* come close

24 to qualifying as an "administrative remedy" that must be exhausted.  This is because

25 the MSHCP does *not* mandate that the RCA even consider a Criteria Refinement, let

26 alone mandate that the RCA "*actually accept, evaluate and resolve disputes or*

27 *complaints*" regarding a Criteria Refinement.  See *City of Coachella v. Riverside*

28 *Cnty. Airport Land Use Com.*, 210 Cal. App. 3d 1277, 1287 (Ct. App. 1989)

1   (Emphasis added).  Instead, a Criteria Refinement is akin to a request for an

2   amendment to a general plan, which courts have consistently ruled is not an

3   administrative remedy.  See, e.g., *Howard v. Cnty. of San Diego*, 184 Cal. App. 4th

4   1422, 1432 (2010).

5       68.    And just because DNBA cannot make use of its property, this does not

6   make its costs of owning the property go away.  DNBA's carrying costs will

7   continue as long as it continues to own the property without being able to develop or

8   sell it, all while the RCA enjoys full conservation of the property for its MSHCP

9   reserve.  Because of the City and RCA's perpetual delay in paying just

10  compensation for DNBA's property, the City and RCA have ensured that there are

11  no competing offers for purchase of this property.

12      69.    The City and RCA's decision to hold DNBA and its property hostage

13  and their refusal to refuse to advance DNBA's JPR application to completion and

14  repeatedly demand that DNBA pursue a Criteria Refinement are both callous and

15  unlawful.  State and federal land-acquisition laws were enacted to prevent such

16  appalling conduct.  Government Code section 7267.5 provides that "[i]n no event

17  shall the public entity … defer negotiations or condemnation … or take any other

18  action coercive in nature, in order to compel an agreement on the price to be paid for

19  the property."  Cal. Gov't Code § 7267.5; *see also* Cal. Code Regs. tit. 25, § 6182,

20  subd. (j)(1); 42 U.S.C. § 4651, subd. (7); 49 CFR § 24.102, subd. (h).  Likewise,

21  Government Code section 7267.6 provides that "[n]o public entity shall

22  intentionally make it necessary for an owner to institute legal proceedings to prove

23  the fact of the taking of his real property."  *See also* Cal. Code Regs. tit. 25, § 6182,

24  subd. (j)(2); 42 U.S.C. § 4651, subd. (8) ; 49 C.F.R. § 24.102, subd. (l) (2005).

25      70.    Recognizing the immense power governments wield in negotiating to

26  acquire property, Congress and the California Legislature have created many other

27  procedural requirements that government agencies must follow when acquiring

28  private property.  For example, the City and RCA must adhere to mandated legal

obligations:  (1) to make reasonable efforts to acquire the property expeditiously; (2) to negotiate in good faith; (3) to negotiate fairly; (4) to avoid any coercive action; and (5) to pay DNBA just compensation, as guaranteed by the Federal and California Constitutions and California and Federal Relocation and Acquisition Acts.  Yet the City and the RCA have failed to adhere to these legal obligations. The City and the RCA have instead directed DNBA through the RCA's made-up HANS/JPR process and then tried to force a made-up Criteria Refinement process with no end-game, no hard-deadlines, and no ultimate requirement (according to the RCA) for the RCA to eventually acquire the property at a fair market price.  *See People ex rel. Dep't of Transportation v. Diversified Props. Co. III*, 14 Cal. App. 4th 429, 443 (1993).

### FIRST CAUSE OF ACTION

### Violations of the Civil Rights Act, 42 U.S.C. Section 1983

### (Inverse Condemnation/De Facto Physical Taking) – Against the City and the RCA

71.    DNBA incorporates by this reference all of the above allegations as though fully set forth herein.

72.    As public entities, the City and the RCA must adhere to certain requirements aimed at protecting landowners when the RCA considers acquisition of privately owned property.  Through their acts under the auspices of the MSHCP, the City and RCA did not comply with any of the statutory requirements provided for under the Eminent Domain Act or under the California Relocation Assistance and Real Property Acquisition Policies Act (Cal. Gov't Code § 7620 et seq.; Cal. Code Regs. tit. 25, § 6000 et seq.) and the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 U.S.C. § 4601 et seq.; 49 C.F.R. § 24.1 et seq. [2005]).  The City and the RCA also did not comply with the negotiation and acquisition mandates and timeframes of the RCA's own MSHCP.

73.    Because of the City and the RCA's acts, omissions, and conduct, the

City and RCA have wrongfully deprived DNBA of any reasonably economically viable use for its property, rendered the property unmarketable, and otherwise damaged the property and DNBA.  The RCA's refusal to acquire DNBA's property expeditiously has ensured that DNBA can obtain no other offer to purchase the property but must wait for the RCA or the City to pay just compensation – payment that the RCA refuses to make indefinitely (if ever).

74.    The City and RCA's actions amount to an unconstitutional, de facto seizure and taking and damaging of DNBA's property – all in fulfillment of the RCA's "core activity" of acquiring property and conserving it to implement the RCA's MSHCP reserve – and for which the RCA has paid no compensation, all in violation of DNBA's constitutional right to be paid just compensation.  In particular, as the U.S. Supreme Court explained in a June 2019 opinion "a taking without compensation violates the self-executing Fifth Amendment at the time of the taking," and thus the constitutional violation takes place when property is taken without compensation, not after the exhaustion of state court remedies.  *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2172 (2019).  The Court used this analogy:

> A bank robber might give the loot back, but he still robbed the bank. The availability of a subsequent compensation remedy for a taking without compensation no more means there never was a constitutional violation in the first place than the availability of a damages action renders negligent conduct compliant with the duty of care.

75.    Further, because of the City and RCA's delay strategy to avoid paying just compensation for DNBA's property, DNBA has suffered precondemnation damages.  *Klopping v. Whittier* 8 Cal.3d 39, 52 (1972) ("[W]hen the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern

1  over property rights requires that the owner be compensated.").  The City and RCA

2  needed to complete MSHCP's entire HANS/JPR process, including negotiations for

3  the purchase of DNBA's property within 179 *days* (45 days for the City's HANS I

4  determination, 14 days for the RCA's JPR determination, plus 120 days for HANS

5  II negotiations).  Thus, under the RCA's own rules and requirements, the RCA

6  should have, at the latest, completed negotiations in early April 2025 following

7  DNBA's submittal of its HANS application.

8      76.    DNBA's total damages are in an amount not yet ascertained, but at

9  least $7,000,000.  In addition, DNBA has incurred and will continue to incur

10  attorneys', appraisal, and other expert fees for the prosecution of this action, which

11  fees are recoverable under 42 U.S.C. section 1988 and California Code of Civil

12  Procedure sections 1021.5 and 1036.

13                    **SECOND CAUSE OF ACTION**

14  **Declaratory Relief Regarding Inverse Condemnation/De Facto Physical Taking**

15                    **– Against the City and the RCA**

16      77.    DNBA incorporates by this reference all above allegations as though

17  fully set forth herein.

18      78.    An actual controversy has arisen between DNBA, on the one hand, and

19  the City and RCA, on the other hand, regarding the duties and obligations of the

20  City and RCA under the law.  Among other things, DNBA contends and, on

21  information and belief, the City and RCA dispute that:

22          a.  The RCA devised, and implemented with the City's help, a years-long,

23              delay strategy to bank/de facto take DNBA's property for the RCA's

24              MSHCP reserve without the RCA's paying just compensation.  To do

25              so, the City and RCA took calculated action which included:  (i)

26              forcing DNBA to needlessly engage in the RCA's MSHCP property-

27              acquisition processes despite knowing all of DNBA's property was

28              needed for the RCA's MSHCP reserve; (ii) refusing to follow the

RCA's MSHCP time limits and other procedural requirements; (iii) demanding that DNBA process a Criteria Refinement; and (iv) refusing to advance DNBA's JPR application completion.

b. As a result of the City and the RCA's years-long delay strategy to bank/de facto take DNBA's property, the City and RCA did not comply with the Fifth Amendment to the United States Constitution, Article I, section 19, of the California Constitution, or any of the statutory requirements provided for under the Eminent Domain Act, and under the California Relocation Assistance and Real Property Acquisition Policies Act (Cal. Gov't Code § 7620 et seq.; Cal. Code Regs. tit. 25, § 6000 et seq.) and the Federal Uniform Relocation Assistance and Real Property Acquisition Policies Act (42 U.S.C. § 4601 et seq.; 49 C.F.R. § 24.1 et seq. [2005]). The purpose of these acquisition acts is to encourage and expedite government acquisition of real property by agreements with owners, to avoid litigation, to assure consistent treatment of owners in various government programs, and to promote public confidence in government land acquisitions. *See, e.g.*, 42 U.S.C. § 4651. Despite its obligations to comply, the City and RCA have violated, and continues to violate, these acquisition acts.

79. DNBA seeks a judicial declaration of the rights and duties of DNBA and the City and RCA with respect to the claims and contentions alleged in paragraph 78 above. Such declaration is necessary and appropriate at this time so that the respective rights and obligations of the parties are ascertained. A judicial declaration is also required because DNBA has suffered and will continue to suffer damages from the City and RCA's actions and inaction.

80. To the extent DNBA must exhaust administrative remedies in a de-facto-physical-taking case like this, DNBA did so on numerous occasions, including, but not limited to, by endeavoring – with the assistance of DNBA's

1  consultants and attorneys – to complete the RCA's purported HANS/JPR process,

2  which the City and the RCA refuse to allow to be completed.

3      81.    Thus, to the extent any other administrative remedies might be

4  available to DNBA, attempting them would be a futile exercise; the City and RCA

5  are single-minded in their efforts to bank/de facto take DNBA's property for the

6  RCA's MSHCP reserve without the RCA's paying just compensation.

7  **THIRD CAUSE OF ACTION**

8  **Declaratory Relief Regarding the Illegality of the RCA's MSHCP Property-**

9  **Acquisition Processes – Against the RCA**

10      82.    DNBA incorporates by this reference all above allegations as though

11  fully set forth herein.

12      83.    An actual controversy has arisen between DNBA, on the one hand, and

13  the RCA, on the other hand, regarding the legality of the RCA's MSHCP property-

14  acquisition processes.  Among other things, DNBA contends and, on information

15  and belief, the RCA disputes that:

16      a.   The RCA's entire MSHCP property-acquisition process, including,

17      but not limited to processes such as:  (1) the "Habitat Acquisition

18      and Negotiation Strategy," (2) the "Joint Project Review" and (3)

19      the "Conflict-Resolution Process," violate the Fifth Amendment to

20      the United States Constitution, Article I, section 19, of the

21      California Constitution, and the statutory requirements provided for

22      under the Eminent Domain Act, and under the California Relocation

23      Assistance and Real Property Acquisition Policies Act (Cal. Gov't

24      Code § 7620 et seq.; Cal. Code Regs. tit. 25, § 6000 et seq.) and the

25      Federal Uniform Relocation Assistance and Real Property

26      Acquisition Policies Act (42 U.S.C. § 4601 et seq.; 49 C.F.R. § 24.1

27      et seq. [2005]).  More specifically, the RCA's MSHCP property-

28      acquisition processes violate, among many other rights, DNBA's

1        right to:  (1) a jury trial (Cal. Const., art. I, § 19); (2) expeditious

2        acquisition of DNBA's property (Cal. Gov't Code § 7267.1, subd.

3        (a)); (3) just compensation based on an "approved appraisal of the

4        fair market value of the property" (Cal. Gov't Code § 7267.2, subd.

5        (a)(1)); and (4) payment up to $5,000 by the RCA toward an

6        independent appraisal.  See Cal. Civ. Proc. §§ 1235.170, 1263.025.

7        84.    DNBA seeks a judicial declaration of the rights and duties of DNBA

8 and the RCA with respect to the claims and contentions alleged in paragraph 83

9 above.  Such declaration is necessary and appropriate at this time so that the

10 respective rights and obligations of the parties are ascertained.  A judicial

11 declaration is also required because DNBA has suffered and will continue to suffer

12 damages from the MSHCP's acquisition policies.

13                      **PRAYER**

14        WHEREFORE, DNBA prays for judgment against the City and RCA as

15 follows:

16 **On the first cause of action for violations of the Civil Rights Act, 42 U.S.C.**

17 **section 1983 (inverse condemnation/de facto physical taking):**

18        1.    For a determination that the actions of the City and the RCA have

19 resulted in Civil Rights Act violations because the City and the RCA have

20 unconstitutionally de facto physically taken DNBA's property;

21        2.    For compensation and damages against the City and the RCA in an

22 amount according to proof, but at least $7,000,000, with interest on that amount at

23 the appropriate legal rate from the date of the taking; and

24        3.    For costs, including, but not limited to, reasonable attorneys' fees as

25 allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure

26 sections 1021.5 and 1036, and otherwise.

27

28

LAW OFFICES
**Allen Matkins Leck Gamble**
**Mallory & Natsis LLP**

4914-3061-9225.2                          -36-

**On the second cause of action for declaratory relief regarding inverse condemnation/de facto physical taking:**

1.     That the rights, duties, and liabilities between DNBA and the City and the RCA be fully determined and declared by this Court, including a declaration of the following:

(a)     The actions of the City and the RCA have resulted in Civil Rights Act violations because the City and the RCA have unconstitutionally de facto physically taken DNBA's property and caused precondemnation damages; and

(b)     For costs, including, but not limited to, reasonable attorneys' fees as allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure sections 1021.5 and 1036, and otherwise.

**On the third cause of action for declaratory relief regarding the RCA's MSHCP property-acquisition processes:**

1.     That the rights, duties, and liabilities between DNBA and the RCA be fully determined and declared by this Court, including a declaration of the following:

(a)     The RCA's MSHCP property-acquisition processes are unconstitutional and violate state and federal land-acquisition law; and

(b)     For costs, including, but not limited to, reasonable attorneys' fees as allowed under 42 U.S.C. section 1988 and California Code of Civil Procedure sections 1021.5 and 1036, and otherwise.

**On all causes of action in the complaint:**

1.     For costs of suit incurred in this litigation; and

1      2.    For all such other and further relief as the Court deems just and proper.

2

3   Dated:  August 1, 2025                    ALLEN MATKINS LECK GAMBLE
                                                MALLORY & NATSIS LLP
4                                            K. ERIK FRIESS
                                             LUCAS A. URGOITI
5

6                                            By:_____*/s/ K. Erik Friess*_____
                                                 K. Erik Friess
7                                                Attorneys for Plaintiff
                                                 DNBA PROPERTIES, LLC, a
8                                                Delaware limited liability company

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, DNBA Properties, LLC, demands a jury trial in this action on all issues so triable.

Dated:  August 1, 2025

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
K. ERIK FRIESS
LUCAS A. URGOITI


By:_____*/s/ K. Erik Friess*_____
K. ERIK FRIESS
Attorneys for Plaintiff
DNBA PROPERTIES, LLC, a
Delaware limited liability company